IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THURMAN MEARIN and NATHAN RILEY, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 11-669 |
| | ) | Judge Fischer/ |
| CARLA SWARTZ, Unit Manager, L-5 Unit | ) | Magistrate Judge Kelly |
| Manager PAUL PALYA, LIEUTENANT | ) | |
| ROBERT KENNEDY, RHU/Capital Case | ) | Re: ECF Nos. 75, 80 |
| Lieutenant, sued in their individual and official | ) | |
| capacities, and SGT. [FIRST NAME | ) | |
| UNKNOWN] OVER, C.O. 1, | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

It is respectfully recommended that the motion for summary judgment filed on behalf of

Plaintiffs (ECF No. 75) be denied.  It is further recommended that the motion for summary filed

on behalf of the remaining Defendants (ECF No. 80) be granted.

## II.    REPORT

Plaintiffs, Thurman Mearin ("Mearin") and Nathan Riley ("Riley"), who were prisoners

incarcerated at the State Correctional Institution at Greene, Pennsylvania ("SCI-Greene") at the

time of the events underlying this suit, bring this pro se civil rights action pursuant to 42 U.S.C.

§ 1983 alleging that they were exposed to excessive amounts of second-hand or environmental

tobacco smoke ("ETS") in violation of their rights provided by the Eighth Amendment.

Following this Court's order dismissing certain Defendants, Mearin's claim remains pending

against Unit Manager Carla Swartz and Unit Manager Paul Palya, and Riley's claim remains

pending against Swartz, Lt. Robert Kennedy and Corrections Officer ("C.O.") Kelly Over.

Mearin indicates that he is now incarcerated at SCI-Forest.  (ECF No. 88).

Presently pending before the Court are cross-motions for summary judgment.  For the

reasons that follow, Plaintiffs' motion should be denied and Defendants' motion should be granted.

## A.    FACTS[1]

### 1.    Mearin's History of ETS Complaints

Prior to his transfer to SCU-Forest, Mearin had been incarcerated at SCI-Greene since 2005, following a transfer from SCI-Graterford. (Defs.' App. Ex. 1).[2] Since July 3, 2009, Mearin was celled in E-Block for the following time periods: August 22, 2008 to July 24, 2009; December 29, 2009 to February 19, 2010; May 25, 2010 to December 2, 2010; and December 7, 2010 to February 15, 2012. Carla Swartz was the Unit Manager of E-Block during that time period. (Swartz Decl. ¶ 1).[3]

Since July 3, 2009, Mearin was celled in D-Block for the period of July 24, 2009 to October 27, 2009. (Defs.' App. Ex. 1). Paul Palya was the Unit Manager of D-Block during that time period. (Palya Decl. ¶ 1).[4]

SCI-Greene has a no-smoking policy in effect for inmates and staff that became effective September 11, 2008. (Defs.' App. Ex. 4). In accordance with the policy, smoking is not permitted inside the facilities at SCI-Greene. Staff or inmates who are caught smoking inside the facility of SCI-Greene are subject to penalties. Defendants state that the no-smoking policy is enforced by corrections officers and officials at SCI-Greene. (Swartz Decl. ¶¶ 6-8; Palya Decl.

---

[1] These facts are taken from Defendants' Concise Statement of Material Facts (ECF No. 82), which are supported by the materials in Defendants' Appendix (ECF No. 83), as required by Local Rule 56(B)(1, 3). Plaintiffs' response to Defendants' Statement (ECF No. 90) denies many of the statement with citations to Plaintiffs' grievances and declarations of other inmates. As indicated below, many of these denials are not based upon personal knowledge.
[2] ECF No. 83.
[3] ECF No. 83 Ex. 2.
[4] ECF No. 83 Ex. 3.

¶¶ 4-7; Kennedy Decl. ¶¶ 2, 7-8;[5] Over Decl. ¶¶ 4-8).[6] Plaintiffs deny that the policy is enforced, citing the grievances they filed and the declarations of other inmates they have submitted. (ECF No. 1: Exs. A, B, C, D, E, F, G; ECF No. 39: Exs. 1, 2, 8, 14, 20; ECF No. 78: Ex. 1).

Because SCI-Greene has a no-smoking policy, an inmate's smoking preferences are not considered when deciding where and with whom to cell an inmate. (Swartz Decl. ¶ 6; Palya Decl. ¶ 7). Unit Manager Swartz states that she is aware of few instances of inmates smoking in E-Block. She has rarely if ever caught an inmate smoking and rarely has ever smelled smoke. She states that, if she did catch an inmate smoking, that inmate would be reprimanded or issued a misconduct. (Swartz Decl. ¶¶ 7-8).[7]

Unit Manager Palya is aware of occasional instances in which inmates would try to sneak smokes in D-block. (Palya Decl. ¶ 5). Generally, the corrections officers in D-block enforced the no-smoking policy through progressive discipline. An inmate's first smoking offense would generally result in a reprimand, and the second offense would result in a misconduct. (Palya Decl. ¶ 6).[8]

Unit Manager Swartz remembers Mearin from his stay in E-Block. (Swartz Decl. ¶ 4). Unit Manager Palya remembers Mearin from his stay in D-block. (Palya Decl. ¶ 2). Mearin always wanted single-cell status but was not eligible for it. (Swartz Decl. ¶ 5; Palya Decl. ¶ 3).[9]

---

[5] ECF No. 83 Ex. 20.
[6] ECF No. 83 Ex. 28.
[7] Plaintiffs "deny" these statements, pointing again to their grievances and the declarations of other inmates. (ECF No. 90 ¶¶ 11-13). However, neither Plaintiffs nor other inmates can speak from personal knowledge about how many instances of smoking Unit Manager Swartz is aware of and thus her statement stands unrefuted. See Fed. R. Civ. P. 56(c)(4) (affidavits must be made on personal knowledge).
[8] Again, Plaintiffs "deny" Unit Manager Palya's statement that he is aware of only occasional instances of inmates smoking (ECF No. 90 ¶¶ 14-16), but they cannot do so based on their personal knowledge.
[9] Mearin denies this statement, contending that he has always been Z-code single-cell status.

He frequently complained about his cellmates. One way he complained about his cellmates was by accusing them of smoking in the cell. (Swartz Decl. ¶ 5).

Mearin filed nine grievances related to smoking between 2009 and 2012. (Defs.' App. Exs. 6, 9, 11, 13, 15, 17). The first was Grievance #279939, dated July 7, 2009, in which Mearin complained that his cellmate smoked. (Defs.' App. Ex. 6). Grievance #279939 was denied and appealed through final review. The grievance mentions Unit Manager Swartz but not Unit Manager Palya. (Defs.' App. Ex. 6).

On November 7, 2011, Mearin wrote an Inmate's Request to Staff Member directed to Unit Manager Swartz. (Defs.' App. Ex. 7). Mearin complained that he was being celled with inmates who smoke. He also wrote, "Ms. Swartz, I've been in prison for 30 years today. You know I don't get along with cellies. What is preventing you from placeing (sic) me in a cell by myself. (sic) Do you hate me that much?" Unit Manager Swartz responded: "This is not a personal issue at all. I do not hate anyone. You simply do not meet the requirements for a Z code and I cannot put you in one. If you can find someone to cell with, let me know and we will make sure you are kept together." (Defs.' App. Ex. 7).

On November 8, 2011, Mearin's medical records indicate he complained that he had a headache which he attributed to an inmate who smoked in his cell. He was seen by Dr. Jin, who advised him to buy Motrin from the commissary and to discuss it with his unit manager. (Defs.' App. Ex. 8).

The next smoking-related grievance filed by Mearin was Grievance #389361, dated November 10, 2011, in which he complained that his cellmate, Inmate Harris (JC3798), smoked in the cell. (Defs.' App. Ex. 9). Grievance #389361 was denied and appealed through final

---

(ECF No. 90 ¶ 19). However, he cites no support for this assertion.

review.  The grievance mentions Unit Manager Swartz but not Unit Manager Palya.  (Defs.' App. Ex. 9).  At the time Mearin filed Grievance #389361, he was housed in cell 2047 in block E-A.  (Defs.' App. Ex. 1).  Inmate Harris was housed in cell 2047 from November 15 to 21, 2011, a total of seven days.  (Defs.' App. Ex. 10).  In the final appeal decision, Mearin was notified that: "If you have a cellmate who is smoking in the cell, it is your responsibility to report the violation to your block officer."  (Defs.' App. Ex. 9).

On November 21, 2011, Mearin's medical records indicate that he complained about a cellmate who smoked, which he claimed gave him a headache and a stomachache.  (Defs.' App. Ex. 8).  He was seen by Dr. Park who prescribed him Fioricet as needed.  According to the U.S. National Library of Medicine, National Institutes of Health, Fioricet is a combination of acetaminophen, butalbital, and caffeine that is used to treat tension headaches (Fioricet listed at bottom under brand names).  (Defs.' App. Ex. 8b).

The next smoking-related grievance was Grievance #390244, dated November 22, 2011, in which Mearin complained that his cellmate, Inmate Smith (KB5484), smoked.  (Defs.' App. Ex. 11).  Grievance #390244 was denied and appealed through final review.  The grievance mentions Unit Manager Swartz but not Unit Manager Palya.  (Defs.' App. Ex. 11).  At the time Mearin filed Grievance #390244, he was housed in cell 2047 in block E-A.  (Defs' App. Ex. 1).  Inmate Smith was housed in cell 2047 from November 22 to 29, 2011, a total of eight days.  (Defs.' App. Ex. 12).

The next smoking-related grievance was Grievance #392716, dated December 7, 2011, in which Mearin complained that his cellmate, Inmate Bullins (CU5278), smoked.  (Defs.' App. Ex. 13).  Grievance #392716 was denied and appealed through final review.  The grievance mentions Unit Manager Swartz but not Unit Manager Palya.  (Defs.' App. Ex. 13).  At the time

Mearin filed Grievance #392716, he was housed in cell 2047 in block E-A. (Defs.' App. Ex. 1). Inmate Bullins was housed in cell 2047 from December 6 to 9, 2011, a total of four days. (Defs.' App. Ex. 14).

The next smoking-related grievance was Grievance #392733, dated December 13, 2011, in which Mearin complained that his cellmate, Inmate Wright (FR1841), smoked. (Defs.' App. Ex. 15). Grievance #392733 was denied and appealed through final review. The grievance mentions Unit Manager Swartz but not Unit Manager Palya. (Defs.' App. Ex. 15). At the time Mearin filed Grievance #392733, he was housed in cell 2047 in block E-A. (Defs.' App. Ex. 1). Inmate Wright was housed in cell 2047 from December 13 to 28, 2011, approximately two weeks. (Defs.' App. Ex. 16).

Mearin filed four smoking-related grievances in 2012, when he was celled in block B-A in cell 2059. (Defs.' App. Ex. 17). He does not mention Unit Managers Swartz or Palya in any of those grievances but complains of three cellmates who smoked, Inmates Davis (KD2441), Amante (KD0935), and Holmes (KA2044). (Defs.' App. Ex. 17). Those inmates were collectively celled with Mearin from June 12 to August 7, 2012 and from October 2 to 18, 2012, a total of a little over two months. (Defs.' App. Ex. 18).

When directed by the grievance officer to submit a request to be celled with an inmate with whom he would be compatible, Mearin wrote: "The problem is I'm not compatible with no prisoners and no one can force me to do it." (Defs.' App. Ex. 17, ECF No. 83-2 at 62). See also id. at 65 ("I've been in prison for 30 years, I'm not compatible with no prisoners and I never will be"); id. at 68 ("This is the suggestion even when it is documented that grievant is not compatible with any prisoners.")

Unit Manager Swartz has no personal knowledge of any of Mearin's cellmates smoking

in the cell.  (Swartz Decl. ¶ 9).  She has no personal knowledge of any health problems suffered by Mearin as a result of second hand smoke.  (Swartz Decl. ¶ 10).  She has no personal knowledge of any visits to medical personnel by Mearin related to exposure to second hand smoke.  (Swartz Decl. ¶ 11).[10]

Unit Manager Palya has no personal knowledge of any of Mearin's cellmates smoking in the cell.  (Palya Decl. ¶ 4).  Mearin did write a request to Unit Manager Palya on July 30, 2009, complaining that a cellmate smoked, but Unit Manager Palya has no personal knowledge that the cellmate actually was smoking.  (Palya Decl. ¶ 4; Defs.' App. Ex. 30).  Unit Manager Palya has no personal knowledge of any health problems suffered by Mearin as a result of second hand smoke.  (Palya Decl. ¶ 8).  He has no personal knowledge of any visits to medical personnel by Mearin related to exposure to second hand smoke.  (Palya Decl. ¶ 9).[11]

Finally, Defendants note that Mearin only complained to medical staff about alleged second-hand smoke problems on November 8 and November 21, 2011, after he had already filed this lawsuit.  (Defs.' App. Exs. 8, 8a).  Mearin denies this statement (ECF No. 90 ¶ 65), but cites no support for his denial.

## 2. Riley's History of ETS Complaints

Riley has been incarcerated at SCI-Greene since 2007, following a transfer from SCI-Smithfield.  (Defs.' App. Ex. 19).  Riley was incarcerated in the restricted housing unit ("RHU") of SCI-Greene during the following times: May 15, 2007 to August 7, 2008; August 19, 2008 to September 29, 2009; October 7, 2009 to December 17, 2009; January 19, 2010 to July 8, 2010;

---

[10] Mearin denies these statements, citing his grievances (ECF No. 90 ¶¶ 58-60).  However, it seems clear that Unit Manager Swartz was not testifying that she was unaware that Mearin was contending that his cellmates smoked or that he claimed it affected his health, only that she could not corroborate his allegations.

[11] Mearin denies these statements, citing his grievances (ECF No. 90 ¶¶ 61-64).  Again, Unit Manager Palya was only indicating that he could not corroborate Mearin's allegations.

July 20, 2010 to December 17, 2010.  (Defs.' App. Ex. 19).

As noted above, SCI-Greene has a no-smoking policy in effect for inmates and staff that became effective September 11, 2008.  (Defs.' App. Ex. 4).  In accordance with the policy, smoking is not permitted inside the facilities at SCI-Greene.  Staff or inmates who are caught smoking inside the facility of SCI-Greene are subject to penalties.  The no-smoking policy is enforced in the RHU.  (Kennedy Decl. ¶ 2).[12]

Prior to September 11, 2008, SCI-Greene had another smoking policy in place.  (Defs.' App. Ex. 5).  According to that policy, smoking was prohibited in many blocks, including but not limited to F, H, and I blocks.  In 2007 and 2008, Riley was celled in F, H, and I blocks.  (Defs.' App. Ex. 19).

Riley filed three smoking-related grievances while in the RHU at SCI-Greene.  (Defs.' App. Exs. 21, 22, 23).  Each of these grievances was denied and was appealed to final review.  In none of those grievances did Riley mention Lt. Kennedy, Unit Manager Swartz, or C.O. Over.  For each of those grievances, Lt. Kennedy was the grievance officer who denied the grievance.  (Defs.' App. Exs. 21, 22, 23).

The first smoking-related grievance filed by Riley while he was in the RHU was Grievance #308877, dated February 28, 2010, in which he complained that second hand smoke was one of several things emitted by the air duct in his cell, causing him to cough and be congested.  (Defs.' App. Ex. 21).  The second smoking-related grievance by Riley was Grievance #308880, also dated February 28, 2010, in which he complained that he was forced to

---

[12] Riley denies this statement (ECF No. 90 ¶ 76), citing the grievances and Lt. Kennedy's declaration which, as noted in the text, states that although inmates complained about the bubble officer smoking and the smoke entering their cells in the RHU, the facts were that this was impossible because of the ventilation system and that the inmates were upset because they were not allowed to smoke.

breathe second hand smoke because corrections officers were smoking in the RHU. (Defs.' App. Ex. 22). The third smoking-related grievance by Riley was Grievance #310087, dated March 8, 2010, in which he complained that cigarette smoke was being emitted through the air vent in his cell and that corrections officers were smoking in the RHU. (Defs.' App. Ex. 23).

According to David Dehuarte, the Utility Plant Supervisor at SCI-Greene, the facility has had a Siemens energy management system since prior to 2007. (Dehuarte Decl. ¶ 3).[13] The system brings in different amounts of fresh air depending on the outside air temperature. (Dehuarte Decl. ¶ 4). If the outside temperature is between approximately 60 and 75 degrees, the ventilation system circulates 100% fresh air brought in from outside. (Dehuarte Decl. ¶ 5). During those time periods, it would not be possible for second hand smoke to travel through the ventilation system as there is no recycled air in the vents. (Dehuarte Decl. ¶ 6).

If the temperature is colder than approximately 60 degrees or warmer than approximately 75 degrees, the heating or air conditioning system turns on. (Dehuarte Decl. ¶ 7). In those cases, the amount of outside air circulating through the ventilation system is reduced to approximately 16%, with the remaining 84% being recycled air. At those times, it is possible for second hand smoke to travel through the ventilation system from the place where it originated into a cell, but it is highly unlikely. (Dehuarte Decl. ¶ 8). The air in the ventilation systems is very diluted, and it would require a large quantity of smoke to travel into the ventilation system from its source for it to be noticeable coming through an air vent into an inmate's cell. (Dehuarte Decl. ¶ 8).

In addition, there is a general exhaust system that pulls air out of every unit. These are located in bathrooms and at certain other places in the prison. This system would further dilute any smoke that could possibly come through the ventilation system. (Dehuarte Decl. ¶ 9;

---

[13] ECF No. 83: Ex. 24.

Kennedy Decl. ¶ 6).[14]

There are also smoke detectors in the air ducts, which would go off if there was a noticeable amount of smoke in them. (Dehuarte Decl. ¶ 10). It is impossible for smoke to travel from the bubble office to the cells in the RHU through the ventilation system. (Kennedy Decl. ¶ 4).[15] Lt. Kennedy remembered a group of inmates who complained about smoke coming from the bubble office into their cells, but since that was impossible he attributed it to their being upset that they were not allowed to smoke. (Kennedy Decl. ¶¶ 3-5).

Lt. Kennedy has no personal knowledge of health problems complained of by Riley as a result of exposure to second hand smoke in the RHU. (Kennedy Decl. ¶ 10). He has no personal knowledge of medical treatment sought by Riley as a result of exposure to second hand smoke in the RHU. (Kennedy Decl. ¶ 11).[16]

Riley filed Grievance #356198, dated March 1, 2011, while in D-B block, in which he complained about exposure to second hand smoke. (Defs.' App. Ex. 25). Grievance #356198 was denied and was appealed to final review. The grievance does not mention any of the defendants in this lawsuit. Unit Manager Palya denied the grievance upon initial review. (Defs.' App. Ex. 25).

Riley sought medical treatment on March 7, 2011, while in D-B block for nasal bleeding, allergy symptoms, chest pain, and cough which he claimed was due to second hand smoke and a bad environment. (Defs.' App. Exs. 19, 26). He was seen by Dr. Park, who injected his sinus, diagnosed him with allergic rhinitis, and prescribed Claritin. (Defs.' App. Ex. 26). Defendants

---

[14] Plaintiffs deny this statement, citing grievances and inmate declarations (ECF No. 90 ¶ 94). Although they can testify based on their personal knowledge that they smelled smoke, they cannot deny Dehuarte's explanation of how the ventilation system worked.

[15] Again, Plaintiffs deny this statement (ECF No. 90 ¶ 96), but have no basis to do so.

[16] Riley denies this statement, citing his grievances (ECF No. 90 ¶¶ 97-98). Again, Lt. Kennedy was testifying that he could not corroborate Riley's allegations, not that he did not make them.

note that Riley has a history of allergies and congestion dating to before he made any allegations concerning second hand smoke. (Defs.' App. Exs. 26, 26a).[17]

Riley also has a history of prescriptions for Loratadine, Chlorpheniramine, and Guaifenesin. (Defs.' App. Ex. 26). According to the U.S. National Library of Medicine, National Institutes of Health, Loratadine and Chlorpheniramine are used to treat allergies. (Defs.' App. Ex. 27). According to the U.S. National Library of Medicine, National Institutes of Health, Guaifenesin is used to treat chest congestion. (Defs.' App. Ex. 27).

After his release from the RHU, Riley was celled in E-block from December 17 to 20, 2010; September 20 to October 13, 2011; and October 27 to November 14, 2011. (Defs.' App. Ex. 19). Unit Manager Swartz is aware of few instances of inmates smoking in E-Block. She has rarely if ever caught an inmate smoking and rarely has ever smelled smoke. If she did catch an inmate smoking, that inmate would be reprimanded or issued a misconduct. (Swartz Decl. ¶¶ 7-8).

The corrections officers on E-Block enforced the no-smoking policy. (Over Decl. ¶ 4). C.O. Over was a corrections officer on E-Block for several years until 2012. (Over Decl. ¶¶ 2-3). E-Block did not have a smoking problem. (Over Decl. ¶ 5). C.O. Over would catch inmates smoking an average of once or twice a month. C.O. Over always disciplined inmates he caught smoking. He would require inmates who were caught smoking to sweep up cigarette butts from outside areas. He would investigate if an inmate complained of another inmate smoking. (Over Decl. ¶ 6).[18] He remembers Riley's name, but not any conversations with him about smoking.

---

[17] Riley denies this statement, citing the Complaint and Dr. Park's attribution of his symptoms on November 3, 2011 to second hand smoke (ECF No. 90 ¶ 105; see ECF No. 83: Ex. 26 at 34).

[18] Riley denies these statements, citing grievances and inmate declarations (ECF No. 90 ¶¶ 116-19), but neither he nor other inmates can speak from personal knowledge about what Over did in general.

He has no personal knowledge of any health problem complained of by Riley as a result of his claim to be breathing second hand smoke at any time, and he has no personal knowledge of any medical treatment sought by Riley concerning symptoms caused by his claimed exposure to second hand smoke. (Over Decl. ¶¶ 9-12).

Riley filed one smoke-related grievance, Grievance #387818, dated November 1, 2011, during the time he was celled in E-block. (Defs.' App. Ex. 29). Grievance #387818 was denied and was appealed to final review. The grievance mentions Unit Manager Swartz but does not mention Lt. Kennedy or C.O. Over. (Defs.' App. Ex. 29). The response noted that Riley had been moved to B-Unit on November 14, 2011, and that he never reported his smoking cellmate to a staff member.

On November 3, 2011, Riley sought medical treatment complaining of nausea, difficulty breathing, headaches, chest pain, vomiting, and inability to eat that he attributed to second hand smoke. He was seen by Dr. Park, who noted that Plaintiff had gained weight and noted that his symptoms potentially were consistent with second-hand smoke exposure. (Defs.' App. Ex. 26 at 34). Defendants note that Riley only complained to medical staff about problems he attributed to second hand smoke on two occasions, March 7 and November 3, 2011, the first shortly before and the second after this lawsuit was filed. (Defs.' App. Exs. 26, 26a).[19]

In support of their motion for summary judgment, Plaintiffs have submitted a Statement of Undisputed Facts, in which they state (generally, and without citation to any evidence of record) that: they have been housed with inmates who smoke; Defendants have refused to enforce the no-smoking policy; it is impossible to fully enforce the no-smoking policy in the RHU; and Plaintiffs are suffering from a myriad of health problems as a result of constant

---

[19] Riley denies this statement (ECF No. 90 ¶ 126), but cites no support for his denial.

exposure to ETS. (ECF No. 77 ¶¶ 1, 3-5, 7-8). Defendants have submitted a response to this statement in which they deny Plaintiffs' contentions, referring to their own Statement and Appendix of Materials in support. (ECF No. 84 ¶¶ 1, 3-5, 7-8).

Plaintiffs have also submitted a Narrative Written Statement, in which they list the exhibits they wish to place into the record, having previously submitted them with the original Complaint or the Amended Complaint. (ECF No. 78). It is noted that these exhibits, which consist of Plaintiffs' inmate requests and grievances, are all contained within Defendants' Appendix, with one exception. On October 29, 2011, Riley wrote a request to Unit Manager Swartz, in which he complained about being housed with inmates who smoked and requesting to be housed with non-smoking inmates in a non-smoking environment. He referred to the fact that she is a defendant in this litigation, but claimed she still refused to honor his request. Unit Manager Swartz responded: "There is no smoking in any buildings at SCI Greene, to include the cells. You should watch the tone and attitude of your request slips." (ECF No. 39: Ex. 26).

### B. PROCEDURAL HISTORY

On May 19, 2011, Plaintiffs submitted a Complaint and on March 26, 2012, they filed an Amended and Supplemental Complaint asserting Eighth Amendment claims contending that they were exposed to excessive amounts of second-hand smoke or ETS. (ECF No. 39). Originally, they named 13 SCI-Greene employees as Defendants and also alleged First Amendment retaliation claims and a claim that certain Defendants violated their rights by instituting a "snitch policy" which required them to inform on fellow inmates, thereby placing them at risk of harm. However, on June 12, 2013, this Court entered an order (ECF No. 69), which adopted a Report and Recommendation filed on May 3, 2013 (ECF No. 65), and granted in part and denied in part the motion to dismiss that Defendants had filed on September 6, 2012 (ECF No. 59). As a result,

only the Eighth Amendment ETS claims against Swartz, Palya, Kennedy and Over remain.

On October 30, 2013, Plaintiffs filed a Motion for Summary Judgment (ECF No. 75) and on November 22, 2013, the remaining Defendants also filed a Motion for Summary Judgment (ECF No. 80). Defendants filed their opposition to Plaintiffs' Motion on November 25, 2013 (ECF No. 85). Plaintiffs filed their brief in opposition to Defendants' Motion on March 28, 2014 (ECF No. 91). As such, the Motions are ripe for review.

### C.     STANDARD OF REVIEW

As amended, effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County

of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Plaintiffs contend that, although SCI-Greene has a no-smoking policy, Defendants Swartz, Palya, Kennedy and Over do not enforce it. Mearin asserts that he has been continually housed with smoking inmates and has submitted a grievance filed by one of his cellmates (Sylvester Perry) who requested to be moved out of Mearin's cell because he (Perry) smoked and Mearin did not. (ECF No. 76: p. 2 & Ex. A). It is noted that Swartz's response to Perry's request was "not an issue, you are <u>not</u> permitted to smoke in the cell or any buildings." He also submits a declaration from Patrick Harris, who states that he smokes and Mearin does not and he (Harris) asked to be moved but his request was denied. (<u>Id.</u>) Mearin also cites various grievances he filed concerning smoke in his cell, which were attached to the Complaint. (<u>Id.</u> at 3; ECF No. 5: Ex. J; ECF No. 39: Exs. 1, 8, 14, 20). He argues that his evidence demonstrates that he was exposed to unreasonably high levels of ETS and that Defendants were deliberately indifferent to his complaints.

Riley similarly indicates that he complained to Swartz, Kennedy and Over about smoking by cellmates, inmates in neighboring cells and staff and correctional officers throughout the housing units including the RHU, and that the ETS exposure has caused or exacerbated his health problems (he suffered headaches, coughs, breathing difficulties, nausea, vomiting and inability to eat). He contends that these Defendants refused to do anything about it.

Plaintiffs argue that, although Defendants are not policy makers, they had knowledge of the smoking infractions and failed to take action to remedy them. Thus, they contend that these individuals may be held liable for the Eighth Amendment violations they suffered.

Defendants contend that: 1) Palya, Kennedy and Over should be dismissed because Plaintiffs did not exhaust their administrative remedies as to them in that they are not mentioned

in Plaintiffs' grievances relating to ETS exposure; 2) Plaintiffs have failed to point to any evidence that Kennedy or Over had any personal involvement in any smoking-related issues, other than denying grievances which is insufficient; and 3) Plaintiffs cannot meet either part of the two-part test for ETS claims. Defendants argue that Plaintiffs fail to satisfy the objective prong because they have no evidence that they were exposed to any level of ETS (much less unreasonable levels), that Defendants have proffered evidence that the ventilation system would not permit excessive amounts of ETS to enter their cells, and Plaintiffs have not pointed to any physical injury related to ETS. Defendants also contend that Plaintiffs fail to satisfy the subjective prong of an ETS claim because SCI-Greene's no-smoking policy was enforced and there is no evidence that Defendants had personal substantiated knowledge of excessive ETS exposure.

Plaintiffs respond that: 1) they made verbal complaints to Palya, Kennedy and Over, and thus the fact that these individuals were not named in their grievances is not dispositive, and that Defendants cured the technical procedural default by participating in the grievance process; 2) there are genuine issues of material fact as to whether Kennedy and Over had any personal involvement, and Plaintiffs have asserted that these individuals failed to correct ongoing violations despite having the power to do so; and 3) the evidence they have presented (the verified Complaint, the grievances and the declarations of other inmates) create genuine issues of material fact as to whether Defendants failed to enforce the no-smoking policy and deliberately housed non-smoking inmates with inmates who smoked.[20]

---

[20] Because Plaintiffs have failed to demonstrate the existence of genuine issues of material fact as to ETS exposure, the Court need not reach the alternative arguments about procedural default and lack of involvement of some of the Defendants.

**D.    DISCUSSION**

**1.    Section 1983 Claims Generally**

It is provided in 42 U.S.C. § 1983 that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

The United States Supreme Court has held that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  "The first step in any such claim is to identify the specific constitutional right allegedly infringed."  Albright v. Oliver, 510 U.S. 266, 271 (1994).  See also Baker, 443 U.S. at 140; Graham v. Connor, 490 U.S. 386, 394 (1989).

**2.    Eighth Amendment ETS Claims**

Plaintiffs' claims invoke the Eighth Amendment's proscription against the imposition of cruel and unusual punishment.  The Eighth Amendment "requires that inmates be furnished with the basic human needs, one of which is 'reasonable safety.'"  Helling v. McKinney, 509 U.S. 25, 33 (1993) (quoting DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200 (1989)).  "Liability based on exposure to ETS requires proof of (1) exposure to unreasonably high levels of ETS contrary to contemporary standards of decency; and (2) deliberate indifference by the authorities to the exposure to ETS."  [Demetrius] Brown v. U.S. Justice Dep't, 271 F. App'x 142, 144 (3d Cir. 2008) (citing Helling, 509 U.S. at 35).  The Supreme Court has observed that the adoption by a prison of an anti-smoking policy "will bear heavily on the inquiry into deliberate indifference."  Helling, 509 U.S. at 36.

The United States Court of Appeals for the Third Circuit has explained that ETS claims come in two varieties, present injury and future injury. With respect to future injury, Helling sets forth the following two-part inquiry for ETS claims:

> The Court explained that the first prong of the Helling test is an objective one: "[The prisoner] must show that he himself is being exposed to unreasonably high levels of ETS." Id. at 35, 113 S.Ct. 2475. With respect to the objective factor, the Court noted that beyond a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS, the Eighth Amendment requires "a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." Id. at 36, 113 S.Ct. 2475 (emphasis in original). The Court stated: "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Id.

> The second prong of the Helling test is a subjective one: whether prison officials were deliberately indifferent to a serious risk of harm. Id. at 36, 113 S.Ct. 2475. The Supreme Court has held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Atkinson v. Taylor, 316 F.3d 257, 262 (3d Cir. 2003). A present injury claim based on exposure to ETS requires proof of: 1) a sufficiently serious medical need related to ETS exposure; and 2) deliberate indifference by the prison authorities to that need. Id. at 266 (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

Thus, both present and future injury claims require an objective component, either that the prisoner be subjected to an unreasonably high level of ETS or that the prisoner suffer from a sufficiently serious medical need; and both require as a subjective component that the prison authorities be deliberately indifferent. Defendants argue that Plaintiffs cannot satisfy either prong.

18

With respect to the objective prong, Defendants argue that courts have dismissed claims brought by prisoners who allege injuries such as eye irritation, nausea, headaches and breathing problems but fail to link these symptoms to ETS exposure. See Abhouran v. United States, 389 F. App'x 179, 183-84 (3d Cir. 2010) (prisoner presented no evidence that smoke came through ventilation system); Goode v. Nash, 2007 WL 201007 (M.D. Pa. Jan. 23, 2007) (despite opportunity to develop a record, the plaintiff relied on only his only speculations that ETS exposure resulted in his nasal discomfort, coughing and other maladies), aff'd, 241 F. App'x 868 (3d Cir. 2007); [Abdul] Brown v. Varner, 2013 WL 4591817, at *18-19 (M.D. Pa. Aug. 28, 2013) (when prisoner filed grievances of ETS but did not have any injuries and was informed that the prison had a no-smoking policy that was enforced, his claims failed); Keyes v. Chamberlin, 2011 WL 113445, at *5 (W.D. Pa. Jan. 13, 2011) (Lenihan, M.J.) (when prisoner claimed ETS exposure at SCI-Graterford but prison proffered evidence of a no-smoking policy that was enforced, his claims failed); Belland v. Matachiski, 2009 WL 1585811, at *5-6 (M.D. Pa. June 3, 2009) (inmate with asthma failed to show that he was injured by ETS or that he was exposed to it at a level that society is unwilling to accept); Buchanan v. United States, 2007 WL 983312, at *8 (M.D. Pa. Mar. 27, 2007) (no evidence other than prisoner's own speculation that ETS exposure caused his eye irritation, nausea, headaches and breathing problems); Meo v. Wall, 2003 WL 22358649, at *3-4 (D.R.I. Sep. 11, 2003) (plaintiffs failed to demonstrate that the ETS that they were exposed to caused them to suffer "serious" current health problems where they had no reported medical condition which could have been aggravated by ETS, but rather shortness of breath, wheezing, tearing of eyes and pains in the chest).

Plaintiffs cite Powers v. Snyder, 484 F.3d 929, 932-33 (7th Cir. 2007), for its observation that "maybe there's a level of ambient tobacco smoke that, whether or not it creates a serious

health hazard, inflicts acute discomfort amounting, especially if protracted, to punishment." However, in the very next line, the court explains that: "Whether the plaintiff's claim rises to this level or instead amounts just to a complaint about something more akin to an annoyance than to oppression, is impossible to determine from the complaint. The judge should have directed the plaintiff to explain his claim in greater detail." Id. at 933. In other words, the case was decided at the motion to dismiss stage, not on a motion for summary judgment with a fully-developed record. Plaintiffs also cite Murrell v. Chandler, 277 F. App'x 341 (5th Cir. Apr. 30, 2008), in which the court observed that the inmate's sworn declaration included the competent summary judgment evidence that: "he was assigned to a non-smoking unit but smokers were housed at the same unit; he was exposed to excessive levels of ETS 12 to 24 hours a day in his housing unit and at the factory where he worked; the smoke was often so thick in his housing unit that he had to hold a wet towel over his face to breathe; he advised the defendants that the no smoking policy was not being enforced and that he was having serious health problems that included migraine headaches and respiratory problems." Id. at 343. However, Plaintiffs' evidence in this case does not resemble the inmate's evidence in Murrell, and the case contains no discussion of the medical records.

Defendants argue that Plaintiffs have produced no evidence to back up their speculative allegations that they were exposed to any level of second hand smoke, much less an amount that society deems intolerable. They filed grievances related to smoke exposure by cellmates, but these grievances were all unsubstantiated and denied. Mearin named several cellmates who he claimed smoked, but he was only celled with them for a short period of time: he spent seven days celled with Inmate Harris (Defs.' App. Exs. 1, 8), eight days with Inmate Smith (Defs.' App. Exs. 1, 12), four days with Inmate Bullins (Defs.' App. Exs. 1, 14), approximately two weeks

with Inmate Wright (Defs.' App. Exs. 1, 16), and about two months total with inmates Davis, Amante, and Holmes (Defs.' App. Exs. 1, 17).  Defendants also note that Mearin made clear in his requests and grievances that his goal was to be single-celled and that he did not get along with any cellmates.  (Swartz Decl. ¶ 5; Palya Decl. ¶ 3; Defs.' App. Exs. 7, 17).  Thus, they contend that there is evidence that his complaints about smoke were really attempts to be celled alone.

Defendants note that Riley spent less than three weeks in E-block, where he was located when he filed his only grievance when he was celled in that unit.  (Defs.' App. Exs. 19, 29).  Riley did spend a longer time in D-Block, where he was celled when he filed another grievance (Defs.' App. Exs. 19, 25), but Defendants contend that there is no evidence whatsoever that any of them had any connection to D-Block.  There is also no evidence whatsoever that the ventilation system in the RHU transported smoke into Riley's cell.  To the contrary, it is highly unlikely that this could have occurred due to the configuration of the ventilation system. (Kennedy Decl. ¶¶ 4, 6; Dehuarte Decl. ¶¶ 5-10).  Furthermore, Defendants argue that there is no evidence that any of them had any control over the ventilation system.  Finally, they contend there is no evidence that the facility-wide no-smoking policy was not enforced, much less that it was unenforced to the extent that smoke levels rose to levels society deems intolerable.

Further, Defendants argue that there is no evidence other than Plaintiffs' speculative allegations that they suffered any injury whatsoever, let alone were harmed by being exposed to second hand smoke.  Both Mearin and Riley complained twice to medical personnel that they suffered symptoms – in Mearin's case headache and stomachache, and in Riley's case headache, stomachache and upper respiratory problems – that they attributed to second hand smoke. (Defs.' App. Exs. 8, 26).  However, there is no evidence that these allegations were

substantiated. Even if they had been substantiated, there is no evidence that their injuries were serious. Further, in Riley's case, he has a history of upper respiratory problems that date to before he arrived at SCI-Greene, and he has regularly taken medications for them. (Defs.' App. Exs. 26, 27). Defendants argue that Plaintiffs' self-serving speculative allegations are not evidence sufficient to create a genuine issue of material fact to withstand a motion for summary judgment based on a failure to meet the objective prong of the <u>Helling</u> analysis, and that a reasonable jury could not possibly find that either Mearin or Riley was exposed to a level of second hand smoke that society deems intolerable or that they sustained any injuries, let alone serious injuries, as a result of smoke exposure.

Defendants also argue that Plaintiffs cannot make out the subjective, deliberate indifference standard of the <u>Helling</u> test because the undisputed evidence of record shows that SCI-Greene has a no-smoking policy that prohibited smoking in all indoor areas and that the policy is enforced. It is undisputed that Plaintiffs were notified of this policy in response to grievances that they filed. There is no evidence that any of the Defendants had personal knowledge that Plaintiffs were exposed to smoke, other than Plaintiffs' own unsubstantiated allegations. To the contrary, the only evidence is that Defendants did *not* have any substantiated knowledge that either Mearin or Riley was exposed to second hand smoke. (Swartz Decl. ¶¶ 9-11, 13-15; Palya Decl. ¶¶ 8-9; Kennedy Decl. ¶¶ 10-11; Over Decl. ¶¶ 10-12). Defendants contend that there is also no evidence that any of them had personal knowledge that Plaintiffs suffered any injuries or sought medical treatment for injuries caused by second hand smoke exposure. To the contrary, the only evidence is that the defendants did not have such personal knowledge. Without personal knowledge, Defendants cannot have been deliberately indifferent. <u>See</u> <u>Panton v. Nash</u>, 317 F. App'x 257, 259 (3d Cir. Mar. 12, 2009) (no deliberate indifference

where warden set out clear smoking regulations and was actively involved in limiting the presence of ETS, and inmate's medical records showed no past or current complaints demonstrating ETS exposure); D'Alessandro v. Bugler Tobacco Co., 2010 WL 5141642, at *4 (D.N.J. Dec. 10, 2010) (inmate with COPD failed to demonstrate deliberate indifference to alleged ETS exposure when prison had no-smoking policy and a procedure for inmates to report other inmates who smoked, and the defendants had no control over cell assignments or whether the cellmate would violate prison regulations by smoking).

Plaintiffs have attached declarations and other documents from other inmates at SCI-Greene related to the smoking policy to their own Motion for Summary Judgment. (Ex. 31; see also ECF 76-1 and 78-1). Defendants contend that these documents do not alter the analysis.

In Warner v. Sherrer, 2005 WL 2416972 (D.N.J. Sep. 30, 2005), an inmate with asthma complained that he was housed with inmates who smoked, despite the prison's no-smoking policy. He stated that he complained to medical staff about having problems such as shortness of breath and difficulty breathing as a result of his exposure to ETS and that smoke and other pollutants passed through the prison's ventilation system. In addition to his own affidavit, he also submitted four affidavits of other inmates who either stated that they were non-smokers forced to share cells with smokers or that they witnessed Warner being housed with smoking cellmates. The court explained:

> These four affidavits fail to provide plaintiff with the evidentiary basis needed to support his cause of action. "'Anecdotal accounts' of smoking at the jail are insufficient.... Rather, to prevail, plaintiff must provide some kind of 'scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that ... injury to [his] health' was actually caused by exposure to ETS." As such, "[t]estimony by fellow inmates that smoking was occurring at the facility is not the kind of objective evidence needed to establish an Eighth Amendment violation. In the absence of any evidence outside of affidavits from fellow inmates that do nothing more than demonstrate imperfect compliance at enforcing the No Smoking Policy, plaintiff fails to satisfy the objective prong of

Helling.

He further fails to establish this prong because he has presented no medical evidence, in the form of affidavit or otherwise, as to the degree, severity or cause of his asthma and other complained of medical conditions, or as to the unreasonably high level of ETS in NSP. "The mere possibility of increased risk of some ailment related to ETS exposure does not amount to a substantial risk of serious harm prohibited by the Eighth Amendment."

Id. at *11-12 (citing Scott v. District of Columbia, 139 F.3d 940, 942 (D.C. Cir. 1998); Hinton v. Williams, 2005 WL 486137, at *2 (D.D.C. Feb. 28, 2005); Meo v. Wall, 2003 WL 22358649, at *5 (D.R.I. Sep. 11, 2003)).

Defendants argue that none of the declarations and other documents submitted by Plaintiffs do anything to shed light on the amount of second hand smoke encountered by Plaintiffs and that not one of these documents shows deliberate indifference on the part of any of the four defendants in this case. Specifically, these documents are as follows:

1) John Laskaris states that he has been subjected to dirty ventilation air coming through the ducts and into his cell and the dayroom areas, that the vents spew fiber glass fibers, dirt and dust; that he takes medicine for sinusitis, that he has grieved conditions of second hand smoke and that the prison would remove one smoking cellmate only to replace him with another; that he endured conditions of dirty air and fiber glass particles in the vent in the RHU; that when he complained about these matters he would lose privileges and suffer retaliation from correctional staff; that the food trays had water in them from the washing machine and the food when eaten would result in diarrhea and other stomach and intestinal ailments; that in the general population he is exposed to second hand smoke coming from adjoining cells, that he continues to take medicine for his sinus problem which does nothing for the second hand smoke; and that his health is being impaired by these conditions that no man should be forced to endure. (ECF No. 78-1 at 1-2).

Defendants contend that most of this declaration does not deal with smoke and that, although Laskaris states he grieved conditions of second hand smoke, Plaintiffs do not provide the grievances and thus they are not part of the record. They reiterate that smoke could not have been coming through his exhaust vent. In addition, they contend that Laskaris does not allege anything rising to the level of smoke exposure required by <u>Helling</u> to meet the objective prong, nor does he allege any personal involvement by any of the Defendants and, therefore, does not show that they were deliberately indifferent.

2) Roderick McKellar states that he is a smoker and has problems with cellmates who do not smoke. (ECF No. 78-1 at 3). Defendants argue that this goes against Plaintiffs' case, as it shows enforcement of the no-smoking policy. If the policy was not enforced, McKellar could smoke with impunity.

3) William Sparks states he does not smoke and had "problems" with his cellmates and the unit officer when he complained about the smoke. (ECF No. 78-1 at 4). He has a doctor's note indicating that he is asthmatic. (<u>Id.</u> at 5). The response to Sparks' grievance states he complained about a cellmate who smoked, and C.O. Over informed him that it is a smoke-free facility. The grievance response, by Unit Manager Swartz, further informed him that the no-smoking policy is enforced to the best of staff's ability. (<u>Id.</u> at 6). Defendants argue that this does not meet the objective prong set forth in <u>Helling</u>, and it goes to show that C.O. Over and Unit Manager Swartz were not deliberately indifferent, as they enforced the no-smoking policy.

4) Doug Spencer states that he does not smoke and states that he has complained to staff about cellmates who do smoke, and he is told to tell them not to smoke. When he asks to be moved, he is told there are no open cells. (ECF No. 78-1 at 8). Defendants contend that this also shows the no-smoking policy is enforced despite Spencer's bald statement otherwise.

5) Stephen Kennedy states that the corrections staff does not enforce the no-smoking policy, but then indicates that when he complains about cellmates smoking he is told to report them. (ECF No. 78-1 at 9). Defendants argue that this shows that the policy is enforced.

6) Stephen Blackstone states that he has had numerous cellmates who smoke and that tobacco is blown through the vents. When he complains, he is told to tell his cellmates and neighbors to stop smoking. When he asks to be moved, he is told there are no open cells. (ECF No. 78-1 at 10). Defendants reiterate that it is not possible for smoke to blow through the vents this way and contend that Blackstone's declaration does not remotely come close to meeting the <u>Helling</u> standard, in that it does not show personal knowledge by any Defendant, and hence fails to establish deliberate indifference, and it shows that the policy is enforced.

7) Sylvester Perry filed an Inmate's Request to Staff Member directed to Carla Swartz, in which he stated that he is a cellmate of Mearin's and he has an issue because he wants to smoke but Mearin does not want him to smoke. Unit Manager Swartz replied that he is not allowed to smoke. (ECF No. 76-1 at 1). Defendants note that this shows that Swartz enforced the no-smoking policy.

8) Patrick Harris states that he was celled with Mearin, and Mearin asked him not to smoke. Harris contends that he asked Officer Greenwall (a non-defendant officer) to move him so he can be housed with someone who smokes, but was told there were no open cells. (ECF No. 76-1 at 2). Defendants contend that this reinforces that Harris is not allowed to smoke regardless of his cellmate.

Defendants contend that these declarations and other documents do not meet the <u>Helling</u> test that, to the extent there was any smoke, it was so bad that contemporary standards of decency prevent anyone from being exposed to it or that any defendant was deliberately

indifferent.  Courts have explained that "imperfect enforcement of a non-smoking policy does not equate to deliberate indifference."  Buchanan, 2007 WL 983312, at *10 (citing Edwards v. Samuels, 2007 WL 81884, at *7 (D.N.J. Jan. 8, 2007)).

This Court concludes that Plaintiffs have failed to meet either prong of the Helling test. With respect to the objective prong, the amount of time that Mearin and Riley allegedly spent with smoking cellmates was short, their complaints are relatively minor and are not linked to ETS exposure and the Defendants have presented evidence that the ventilation system make it unlikely that they were exposed to any significant level of ETS.  Riley's history of upper respiratory problems predated his arrival at SCI-Greene, and he has regularly taken medications for them.

With respect to the subjective prong, the prison has a no-smoking policy and although it may not have been completely enforced at all times, Defendants have presented evidence that it was enforced to the best of their ability, that Plaintiffs failed to report alleged violators to their block officers as they were directed to do, that when Mearin was offered the opportunity to choose a cellmate he responded that he could not get along with anyone, and that whether or not an inmate smoked was not taken into consideration when making cell assignments.  Thus, there is no basis upon which a trier of fact could conclude that Defendants were deliberately indifferent to Plaintiffs' alleged serious medical needs.

For these reasons, it is respectfully recommended that the Motion for Summary Judgment filed on behalf of Plaintiffs (ECF No. 75) be denied.  It is further recommended that the Motion for Summary Judgment filed on behalf of the remaining Defendants (ECF No. 80) be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule

established in the docket entry reflecting the filing of this Report and Recommendation.

Objections are to be submitted to the Clerk of Court, United States District Court, 700 Grant

Street, Room 3110, Pittsburgh, PA 15219. Failure to timely file objections will waive the right

to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011). Any party opposing

objections may file their response to the objections within fourteen (14) days thereafter in

accordance with Local Civil Rule 72.D.2.

Respectfully submitted,


/s/ Maureen P. Kelly
MAUREEN P. KELLY
United States Magistrate Judge

Dated: April 7, 2014

cc:     Thurman Mearin
        AM-8063
        SCI Forest
        P.O. Box 945
        Marienville, PA 16239

        Nathan Riley
        CT-8571
        SCI Greene
        175 Progress Drive
        Waynesburg, PA 15370

        All Counsel of Record via CM/ECF